FEDERAL DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

BIGREDS.COM INC. and RBT, Inc.

**08    1334**

Index No_____

JURY TRIAL
DEMANDED

Plaintiff,

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  APR 12 2008  ★

BROOKLYN OFFICE

- Against-

GOTO INC.OVERTURE SERVICES LTD.
OVERTURE SERVICES INC.; YAHOO INC. and
JOHN DOES 1-100,

MAUSKOPF, J.

J. ORENSTEIN, M.J.

Defendants,

--------------------------------------------------------------X    COMPLAINT

Plaintiffs Bigreds.Com Inc. and RBT, Inc., by their attorney Ira N. Weinstein,

Complaining of defendants herein hereby allege as follows:

1) Plaintiff, Bigreds.Com Inc. and RBT, Inc. are New York corporations, with their

principal place of business located at 6103 Strickland Ave., Brooklyn, New York.

2) Plaintiff Bigreds.Com Inc. has been assigned causes of action from RBT, Inc., a New

York corporation  under same ownership and control as Bigreds.Com Inc., hereinafter

both entities shall be referred to herein as "plaintiff".

3) Defendant GoTo Inc, is a Delaware Corporation with Offices at 1065 Ave. of the

Americas, New York New York 10018

4) Defendant Overture Services Inc is a Delaware Corporation , doing business in New

York with offices at 1065 Ave. of the Americas, New York New York 10018

5) On information and belief defendant GoTo Inc. changed its name to Overture

Services Inc. on October 8, 2001 and was thereafter acquired by Yahoo Inc. in 2003.

1

6) Defendant Overture Services Ltd .is a Limited Liability Company with it's principal

   place of business at 125 Shaftesbury Avenue, London WC2H 8AD England, UK

7) Defendants Overture Services Ltd .is a wholly owned subsidiary of Yahoo Inc. ,

8) Hereinafter, all Overture, GOTO.Com and Yahoo defendants shall be referred to

   herein as "Overture".

9) On information and belief, Defendants John Does 1-100 are affiliates of or associates

   of Overture.

10) Hereinafter John Does 1-100 shall be referred to herein as "Affiliates".

## JURISDICTION AND VENUE

10a) Diversity Jurisdiction is obtained through 28 USC§ 1332 as the parties are from

different States and Countries. All parties are engaged in interstate commerce. The amount

in controversy exceeds $1,000,000.00.

## FACTS COMMON TO ALL CAUSES OF ACTION

11) Overture , *inter alia*, is in the business of providing pay –per-click internet

   search for keywords of advertisers and businesses , who can be searched for  by

   consumers on   Overture's   search engine websites.

12) Affiliates of  Overture are paid by Overture for generating click traffic on the

   Overture pay per click search. Affiliates show the Overture keyword results on their

   respective websites to consumers (customers) who then in turn are directed to

   advertiser's websites for specific goods and services being sought by consumers..

13) Plaintiff has been  a Overture advertiser since 2000 and has been billed by and has

   paid  Overture $936,403.58 for the period   March 24, 2002 thru   July , 2006.

2

14) Plaintiff opened a bidding account on Overture to bid for keyword placement position in search results on the Overture search engine for results of specific keyword searches by consumers who used the Overture search engine.

15) Overture reported employing 50 factors considered in determining if "clicks" are genuine.(see exhibit "A" attached hereto and made part hereof) and in doing so represented that only "actual traffic" would be charged to plaintiffs; That plaintiff would be charged only "when customers click your ad in search results".

15b) "Overture created an "affiliate program" whereby any person or entity with a website could link to Overture's keyword search results, and be paid for by Overture for generating traffic for the Overture search results ( see affiliate contract exhibit "B" attached hereto)

16) Overture agreed to pay , under the "affiliate program" up to 12% (twelve per cent) commission on clicks generated, to the affiliates, and in turn collect from plaintiff and other advertisers charges bid for clicks on the respective keywords. In some cases plaintiff had bid and paid Overture over 3.00 per click.(for example, see exhibit "C" attached , additional affiliate program).

17) On information and belief, affiliates of Overture used software programs, employed people, and/or directed people other than actual consumers to click on plaintiffs links from keyword search results.

3

18) Sometime in February 2006, it came to plaintiff's attention through the media and other sources that these clicks were not actual traffic, but were fraudulent clicks, now known as "click fraud".

19) At no time did Overture alert plaintiff's that there were fraudulent clicks being made..

20) On or after February 27, 2006 plaintiff came into possession of a "Business Week Online" report exposing click fraud by pay per click search engines.
(See Report from Yahoo, exhibit "D' attached hereto).

21) Plaintiff complained to Overture about these fraudulent clicks .

22) Defendant informed plaintiff that it conducted an investigation and was able to ascertain that there were in fact "Bad Clicks" , but would only investigate a two month period.

23) On information and belief, Overture was able to tell what was bad, who conducted the Bad Click, where it came from, what keyword was involved and generally had superior technology and access to records in its dominion and control that enabled Overture to determine what persons or entities, i.e. affiliates were involved.

24) These affiliates involved were known to Overture, the affiliates did business with Overture, and as such, had set up affiliate accounts that included necessary information about the aforesaid affiliates, including, but not limited to: The names of principals ; the address; telephone; email address; web domain; bank account; the Overture account itself, along with books and records of transactions, payments, credits, debits and reversals and more importantly to the within action, the click records that were charged to plaintiff and amounts paid to the affiliates.

4

25) Overture offered a credit of $17,082.80 for admitted "Bad Clicks" billed to plaintiff during a two month period April 28, 2006 to June 28, 2006 (a copy of the credit is attached hereto and made part hereof as exhibit "E").

26) During the aforesaid 2 month period, plaintiff was billed and paid Overture for $72,113.68 in pay per click charges.

27) During the period January 2002 through July, 2006, plaintiffs were billed and paid Overture for $936,403.58 in pay per click charges.

## AS AND FOR A FIRST CAUSE OF ACTION-BREACH OF CONTRACT

28) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "27" as if fully set forth herein.

29) Overture had agreed to charge only for actual keyword traffic which click thru to plaintiff's websites on plaintiff's keywords.

30) From the period January 2002 through July, 2006 Overture knew that there was bad (fraudulent) traffic and did not credit plaintiff's account for the bad (fraudulent) click traffic.

31) Overture breached its agreement in billing plaintiffs $936,403.58 without regard to whether the billing was actual traffic.

32) Overture breached its covenant of good faith and fair dealing, and agreements to Charge for only actual traffic.

33) On information and belief the amount of bad (fraudulent ) clicks for the period January 2002 through July, 2006 amounted to $204,740.60.

WHEREFORE, plaintiffs demand judgment against defendants Overture for its first cause of action for breach of contract in the amount of $204,740.60

## AS AND FOR A SECOND CAUSE OF ACTION- FRAUDULENT CONCEALMENT

34) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "33" as if fully set forth herein.

35) Defendant Overture had a contractual duty to eliminate fraudulent clicks and to charge plaintiffs only for actual customer traffic.

36) Special facts exist in that defendant Overture possessed superior knowledge of the events, transactions, parties and the facts due to superior technology and possession and control of data that was readily available to Defendant Overture.

37) Overture recognized that fraudulent activity existed, had the ability to ascertain which clicks were fraudulent; but instead concealed these facts from plaintiff.

38) On information and belief, Overture knew the extent of the fraud, but did not notify plaintiff. At best, there was a reckless disregard to the truth of the business being conducted between the parties.

39) Overture profited from not disclosing the fraudulent (bad) clicks to plaintiff, benefiting from each and every fraudulent click from the period March 24, 2000 through July, 2006.

40) The fraud is of such a nature as to be self concealing, as plaintiff had no way of knowing what affiliates were engaged in systematic click fraud; which were suspect; which had been found to have registered fraudulent clicks against other Overture advertisers.

41) Plaintiff relied on the superior technology of Overture, its access to the facts and data and Overture's truthfulness, but the facts were concealed from plaintiff by Overture.

42) As a result of Overture's concealment of the various click fraud schemes and history and data in Overtures possession, plaintiff was damaged to the extent of billings generated from fraudulent clicks.

43) On information and belief, the amount of fraudulent clicks concealed by Overture defendants from plaintiff over the period March 24, 2000 through July, 2006, amounts to $204,740.60.

WHEREFORE, Plaintiff demands judgment on its second cause of action for damages for fraudulent concealment in the amount of $204,740.60.

## AS AND FOR A THIRD CAUSE OF ACTION- FRAUD BY JOHN DOES 1-100

44) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "33" as if fully set forth herein.

45) John Does 1-100 are affiliates of Defendant Overture.

46) John Doe defendants profited by generating fraudulent (bad) clicks to plaintiff,
benefiting from each and every fraudulent click from the period March 24, 2000
through July, 2006.

47) The John Doe defendants are known to Defendant Overture but unknown to plaintiff.

48) On information and belief, the amount of fraudulent clicks by John Doe defendants
1-100 over the period January 2002 through July, 2006, amounts to $204,740.60.

WHEREFORE, plaintiff demands judgment on its Third Cause of Action against
John Doe defendants1-100 in the amount of $204,740.60.

## AS AND FOR A FOURTH CAUSE OF ACTION- PUNITIVE DAMAGES

49) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1"
thru "48" as if fully set forth herein.

50) Plaintiffs demand punitive damages in the amount of $614,221.80 against all
defendants for the fraudulent concealment of Defendant Overture and for the Fraud of
defendants John Does 1-100

WHEREFORE, plaintiff demands judgment on its fourth cause of action for punitive damages against all defendants in the amount of $614,221.80.

## AS AND FOR A FIFTH CAUSE OF ACTION- COURT ORDER DIRECTING DEFENDANT OVERTURE TO DISCLOSE IDENTIDY AND ALL IMFORMATION IN ITS POSSESION OR CONTROL AS JOHN DOE DEFENDANTS 1-100

51) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "50" as if fully set forth herein.

52) As plaintiff has claims against defendants that are known to Overture, but unknown to plaintiff, plaintiff will be without recourse against the said John Doe defendants unless they are disclosed by defendant Overture to plaintiff.

WHEREFORE, Plaintiff demand judgment ordering defendant Overture to fully disclose to plaintiff the identities, contact information and other information concerning the fraudulent activity to plaintiffs by John Does 1-100 known or ascertainable by defendant Overture .

## AS AND FOR A SIXTH CAUSE OF ACTION- FOR AN ORDER OF ATTACHMENT ON ALL DEBTS OWED BY DEFENDANT OVERTURE TO JOHN DOE DEFENDANTS 1-100

53) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "50" as if fully set forth herein

54) As defendant Overture has control over the accounts of John Does 1-100.

55) On information and belief, Defendant Overture is indebted to defendants John Does 1-100 in sufficient amounts to satisfy the judgments sought herein.

56) As the John Doe defendants could be located anywhere in the world, plaintiff will be without recourse against the said defendants unless an Order of Attachment is granted restraining any further transfer of funds to the said defendants by Overture.

WHEREFORE, plaintiff demands an Order of Attachment against all debts owed by Defendant Overture to John Doe defendants 1-100.

## IN CONCLUSION

WHEREFORE, Plaintiff demands judgment as follows:

1. Judgment against defendant Overture in the amount of $204,740.60 on its first cause of action for breach of contract.

2. Judgment against defendant Overture in the amount of $204,740.60 on its second cause of action for fraudulent concealment.

3. Judgment against defendants John Does 1-100 in the amount of $204,740.60 on its third cause of action for fraud.

4. Judgment against all defendants in the amount of $614,221.80 on its fourth cause of action for punitive damages.

5. Judgment ordering defendant Overture to fully disclose to plaintiff the identities, contact information and other information and data concerning the fraud of John Does 1-100. .

5. Granting an Order of Attachment if favor of plaintiff, restraining defendant Overture from transferring any funds to John Doe defendants 1-100.

along with such other, further or different relief as to the Court may seem just, proper and reasonable under the circumstances herein.

Dated: Brooklyn, New York

    March 21, 2008               Yours, etc.

                             IRA N. WEINSTEIN (5783)
                             *Attorney for Plaintiff(s)*
            :                 2200 Mill Ave.
                             Brooklyn, NY 11234
                             Tel: 718-241-2430

FEDERAL DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BIGREDS.COM INC. and RBT, Inc.                          Index No_____

                                                        JURY TRIAL
                                                        DEMANDED

                        Plaintiff,

-   Against-

GOTO INC.OVERTURE SERVICES LTD.
OVERTURE SERVICES INC.; YAHOO INC. and
JOHN DOES 1-100,

                        Defendants,

-------------------------------------------------------------------X    <u>COMPLAINT</u>

                Plaintiffs Bigreds.Com Inc. and RBT, Inc., by their attorney Ira N. Weinstein,

Complaining of defendants herein hereby allege as follows:

1) Plaintiff, Bigreds.Com Inc. and RBT, Inc. are New York corporations, with their

   principal place of business located at 6103 Strickland Ave., Brooklyn, New York.

2) Plaintiff Bigreds.Com Inc. has been assigned causes of action from RBT, Inc., a New

   York corporation under same ownership and control as Bigreds.Com Inc., hereinafter

   both entities shall be referred to herein as "plaintiff".

3) Defendant GoTo Inc, is a Delaware Corporation with Offices at 1065 Ave. of the

   Americas, New York New York 10018

4) Defendant Overture Services Inc is a Delaware Corporation , doing business in New

   York with offices at 1065 Ave. of the Americas, New York New York 10018

5) On information and belief defendant GoTo Inc. changed its name to Overture

   Services Inc. on October 8, 2001 and was thereafter acquired by Yahoo Inc. in 2003.

6) Defendant Overture Services Ltd .is a Limited Liability Company with it's principal place of business at 125 Shaftesbury Avenue, London WC2H 8AD England, UK

7) Defendants Overture Services Ltd .is a wholly owned subsidiary of Yahoo Inc. ,

8) Hereinafter, all Overture, GOTO.Com and Yahoo defendants shall be referred to herein as "Overture".

9) On information and belief, Defendants John Does 1-100 are affiliates of or associates of Overture.

10) Hereinafter John Does 1-100 shall be referred to herein as "Affiliates".

10a) Diversity Jurisdiction is obtained through 28 USC§ 1332 as the parties are from different States and Countries. All parties are engaged in interstate commerce.

11) Overture , *inter alia*, is in the business of providing pay –per-click internet search for keywords of advertisers and businesses , who can be searched for by consumers on   Overture's   search engine websites.

12) Affiliates of  Overture are paid by Overture for generating click traffic on the Overture pay per click search. Affiliates show the Overture keyword results on their respective websites to consumers (customers) who then in turn are directed to advertiser's websites for specific goods and services being sought by consumers..


## FACTS COMMON TO ALL CAUSES OF ACTION


13) Plaintiff has been  a Overture advertiser since 2000 and has been billed by and has paid  Overture $936,403.58 for the period   March 24, 2002   thru July , 2006.

14) Plaintiff opened a bidding account on Overture to bid for keyword placement position in search results on the Overture search engine for results of specific keyword searches by consumers who used the Overture search engine.

15) Overture reported employing 50 factors considered in determining if "clicks" are genuine.(see exhibit "A" attached hereto and made part hereof) and in doing so represented that only "actual traffic" would be charged to plaintiffs; That plaintiff would be charged only "when customers click your ad in search results".

15b) "Overture created an "affiliate program" whereby any person or entity with a website could link to Overture's keyword search results, and be paid for by Overture for generating traffic for the Overture search results ( see affiliate contract exhibit "B" attached hereto)

16) Overture agreed to pay , under the "affiliate program" up to 12% (twelve per cent) commission on clicks generated, to the affiliates, and in turn collect from plaintiff and other advertisers charges bid for clicks on the respective keywords. In some cases plaintiff had bid and paid Overture over 3.00 per click.(for example, see exhibit "C" attached , additional affiliate program).

17) On information and belief, affiliates of Overture used software programs, employed people, and/or directed people other than actual consumers to click on plaintiffs links from keyword search results.

18) Sometime in February 2006, it came to plaintiff's attention through the media and other sources that these clicks were not actual traffic, but were fraudulent clicks, now known as "click fraud".

19) At no time did Overture alert plaintiff's that there were fraudulent clicks being made..

20) On or after February 27, 2006 plaintiff came into possession of a "Business Week Online" report exposing click fraud by pay per click search engines.

(See Report from Yahoo, exhibit "D' attached hereto).

21) Plaintiff complained to Overture about these fraudulent clicks .

22) Defendant informed plaintiff that it conducted an investigation and was able to ascertain that there were in fact "Bad Clicks" , but would only investigate a two month period.

23) On information and belief, Overture was able to tell what was bad, who conducted the Bad Click, where it came from, what keyword was involved and generally had superior technology and access to records in its dominion and control that enabled Overture to determine what persons or entities, i.e. affiliates were involved.

24) These affiliates involved were known to Overture, the affiliates did business with Overture, and as such, had set up affiliate accounts that included necessary information about the aforesaid affiliates, including, but not limited to: The names of principals ; the address; telephone; email address; web domain; bank account; the Overture account itself, along with books and records of transactions, payments, credits, debits and reversals and more importantly to the within action, the click records that were charged to plaintiff and amounts paid to the affiliates.

4

25) Overture offered a credit of $17,082.80 for admitted "Bad Clicks" billed to plaintiff during a two month period April 28, 2006 to June 28, 2006 (a copy of the credit is attached hereto and made part hereof as exhibit "E").

26) During the aforesaid 2 month period, plaintiff was billed and paid Overture for $72,113.68 in pay per click charges.

27) During the period January 2002 through July, 2006, plaintiffs were billed and paid Overture for $936,403.58 in pay per click charges.


### AS AND FOR A FIRST CAUSE OF ACTION-BREACH OF CONTRACT


28) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "27" as if fully set forth herein.

29) Overture had agreed to charge only for actual keyword traffic which click thru to plaintiff's websites on plaintiff's keywords.

30) From the period January 2002 through July, 2006 Overture knew that there was bad (fraudulent) traffic and did not credit plaintiff's account for the bad (fraudulent) click traffic.

31) Overture breached its agreement in billing plaintiffs $936,403.58 without regard to whether the billing was actual traffic.

32) Overture breached its covenant of good faith and fair dealing, and agreements to Charge for only actual traffic.

33) On information and belief the amount of bad (fraudulent ) clicks for the period

January 2002 through July, 2006 amounted to $204,740.60.

WHEREFORE, plaintiffs demand judgment against defendants Overture for its

first cause of action for breach of contract in the amount of $204,740.60

## AS AND FOR A SECOND CAUSE OF ACTION- FRAUDULENT CONCEALMENT

34) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1"

thru "33" as if fully set forth herein.

35) Defendant Overture had a contractual duty to eliminate fraudulent clicks and to

charge plaintiffs only for actual customer traffic.

36) Special facts exist in that defendant  Overture possessed superior knowledge of the

events, transactions, parties and the facts due to superior technology and possession

and control of data that was readily available to Defendant Overture.

37) Overture  recognized that fraudulent activity existed, had the ability to ascertain

which clicks were fraudulent; but instead concealed these facts from plaintiff.

38) On information and belief, Overture knew the extent of the fraud, but did not notify

plaintiff. At best, there was a reckless disregard to the truth of the business being

conducted between the parties.

39) Overture profited from not disclosing the fraudulent (bad) clicks to plaintiff,

benefiting from each and every fraudulent click from the period March 24, 2000

through July, 2006.

40) The fraud is of such a nature as to be self concealing, as plaintiff had no way of knowing what affiliates were engaged in systematic click fraud; which were suspect; which had been found to have registered fraudulent clicks against other Overture advertisers.

41) Plaintiff relied on the superior technology of Overture, its access to the facts and data and Overture's truthfulness, but the facts were concealed from plaintiff by Overture.

42) As a result of Overture's concealment of the various click fraud schemes and history and data in Overtures possession, plaintiff was damaged to the extent of billings generated from fraudulent clicks.

43) On information and belief, the amount of fraudulent clicks concealed by Overture defendants from plaintiff over the period March 24, 2000 through July, 2006, amounts to $204,740.60.

WHEREFORE, Plaintiff demands judgment on its second cause of action for damages for fraudulent concealment in the amount of $204,740.60.

## AS AND FOR A THIRD CAUSE OF ACTION- FRAUD BY JOHN DOES 1-100

44) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "33" as if fully set forth herein.

45) John Does 1-100 are affiliates of Defendant Overture.

46) John Doe defendants profited by generating fraudulent (bad) clicks to plaintiff,

benefiting from each and every fraudulent click from the period March 24, 2000

through July, 2006.

47) The John Doe defendants are known to Defendant Overture but unknown to plaintiff.

48) On information and belief, the amount of fraudulent clicks by John Doe defendants

1-100 over the period January 2002 through July, 2006, amounts to $204,740.60.

WHEREFORE, plaintiff demands judgment on its Third Cause of Action against

John Doe defendants1-100 in the amount of $204,740.60.

## AS AND FOR A FOURTH CAUSE OF ACTION- PUNATIVE DAMAGES

49) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1"

thru "48" as if fully set forth herein.

50) Plaintiffs demand punitive damages in the amount of $614,221.80 against all

defendants for the fraudulent concealment of Defendant Overture and for the Fraud of

defendants John Does 1-100

WHEREFORE, plaintiff demands judgment on its fourth cause of action for punitive damages against all defendants in the amount of $614,221.80.

## AS AND FOR A FIFTH CAUSE OF ACTION- COURT ORDER DIRECTING DEFENDANT OVERTURE TO DISCLOSE IDENTIDY AND ALL IMFORMATION IN ITS POSSESION OR CONTROL AS JOHN DOE DEFENDANTS 1-100

51) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "50" as if fully set forth herein.

52) As plaintiff has claims against defendants that are known to Overture, but unknown to plaintiff, plaintiff will be without recourse against the said John Doe defendants unless they are disclosed by defendant Overture to plaintiff.

WHEREFORE, Plaintiff demand judgment ordering defendant Overture to fully disclose to plaintiff the identities, contact information  and other information concerning the fraudulent activity to plaintiffs by John Does 1-100 known or ascertainable by defendant Overture .

## AS AND FOR A SIXTH CAUSE OF ACTION- FOR AN ORDER OF ATTACHMENT  ON ALL DEBTS OWED BY DEFENDANT OVERTURE TO JOHN DOE DEFENDANTS 1-100

53) Plaintiff reaffirms and realleges allegations contained in paragraphs numbered "1" thru "50" as if fully set forth herein

54) As defendant Overture has control over the accounts of John Does 1-100.

55) On information and belief, Defendant Overture is indebted to defendants John Does 1-100 in sufficient amounts to satisfy the judgments sought herein.

56) As the John Doe defendants could be located anywhere in the world, many being nondomiciliaries or unlicensed foreign corporations, plaintiff will be without recourse against the said defendants unless an Order of Attachment is granted restraining any further transfer of funds to the said defendants by Overture.

WHEREFORE, plaintiff demands an Order of Attachment against all debts owed by Defendant Overture to John Doe defendants 1-100.

## IN CONCLUSION

WHEREFORE, Plaintiff demands judgment as follows:

1. Judgment against defendant Overture in the amount of $204,740.60 on its first cause of action for breach of contract.

2. Judgment against defendant Overture in the amount of $204,740.60 on its second cause of action for fraudulent concealment.

3. Judgment against defendants John Does 1-100 in the amount of $204,740.60 on its third cause of action for fraud.

4. Judgment against all defendants in the amount of $614,221.80 on its fourth cause of action for punitive damages.

5. Judgment ordering defendant Overture to fully disclose to plaintiff the identities, contact information and other information and data concerning the fraud of John Does 1-100. .

5. Granting an Order of Attachment if favor of plaintiff, restraining defendant Overture from transferring any funds to John Doe defendants 1-100.

along with such other, further or different relief as to the Court may seem just, proper and reasonable under the circumstances herein.


Dated: Brooklyn, New York

March 21, 2008

Yours, etc.,

IRA N. WEINSTEIN (5783)
*Attorney for Plaintiff(s)*
2200 Mill Ave.
Brooklyn, NY 11234
Tel: 718-241-2430

:

.

‘

SEO Insight Newsletter:

Search The V7N Directory:

« 21 Link Building Ideas
Copyright Law Explained »

March 21st, 2006

# Yahoo Click Fraud



## Overture's "Click Protection"

Overture's "click protection" is reported by Overture to analyze each click through; it is designed to detect click fraud based on the following
factors:

- The user's IP address - The network range of the IP address
- The user's cookies
- The user's browser information
- The search term requested by the user
- The time of the click

- The rank of the advertiser's listing
- The bid of the advertiser's listing
- The time of the search
- The time of the click

Over 50 factors are considered when determining whether or not a click is "genuine".

## The Problem With Overture PPC

Overture operates one of the most widely distributed pay per click search engines on the Internet. Overture's only real competition is Google Adwords;
Overture - formerly known as Goto - is older and more well known.

The problem of Overture click fraud has been the topic of hundreds of discussions on Internet message boards, and by any estimate has cost advertisers
millions of dollars. The term "click fraud", however, is misleading. I may go to Overture and search for "web hosting" (Advertiser's Max Bid: $12.99) and click on the top listing. Did I commit a criminal act of fraud?
*No.* To be sure, the advertiser would prefer that potential customers click on the listing. I am not a potential customer - I own V7 Inc Hosting, so I'm in fact a competitor. But I did not commit a criminal act. A more accurate term would be "nuisance clicks".

## Who Is Clicking On Who?

Business is better with Yahoo! Search Engine Marketing

Page 1 of 1

# YAHOO! SMALL BUSINESS

New User? Sign Up

Small Business Home – Help

**Yahoo! Small Business Sections:**
Home
Products
News & Resources
Manage your services:
Small Business
Search Marketing
Secondary Navigation
Web Hosting
Ecommerce
Domains
Business Email
Search Engine Marketing
Internet Access
Ads for your business appear in search results on Yahoo! and other popular web sites.
How does it work?
Ads for your business appear in search results on Yahoo! and other popular web sites.

View Demo

**Ready to advertise?**

Sign Up

**Questions?**
1-866-747-7327
Mon-Fri, 6am-6pm PST.
**Learn More:**
Home
How does it work?
What's included?
How much does it cost?
Steps for signing up



• Your business here.

You create an ad to appear in search results.
You choose keywords related to the products or services your business sells.
You write a text ad to promote your business in search results.
You decide the maximum amount you want to pay each time your ad is clicked.
Interested customers search for what you sell.
When a searcher types one of your keywords into a Yahoo! search box, your ad appears.
Your maximum cost-per-click (bid) and ad quality determine where your ad is displayed in search results.
When customers click your ad, they go to your web site.
You pay only when your ad is clicked in search results—not every time it is displayed.
The amount you pay is based on the maximum cost-per-click you specified.

Sign Up  Sign up online or call 1-866-747-7327 Mon-Fri, 6am-6pm PST.

Copyright © 2008 Yahoo! Inc. All rights reserved
Copyright/IP Policy | Terms of Service | Trademarks | Patents | Help | Marketing Alliances | Advertise Internationally
NOTICE: We collect personal information on this site. To learn more about how we use your information, see our Privacy Policy.

Fallback content goes here, in case user doesnt have Flash or JS.


**PUBLISHER NETWORK**

## Yahoo! Search Marketing
## Yahoo! Publisher Network Beta Program - Terms and Conditions

Welcome to the Yahoo! Publisher Network Beta Program. By enrolling in the Yahoo! Publisher Network Beta Program ("Beta Program"), you are entering into a legally binding agreement with Overture Services, Inc., doing business as Yahoo! Search Marketing ("Yahoo! Search Marketing", "Overture" or "we", "our" and "us"). This agreement is comprised solely of these Terms and Conditions ("Agreement" or "Terms"), including anything explicitly incorporated by reference. If you do not agree to these Terms, please do not enroll in the Beta Program.

The Beta Program is offered to businesses including sole proprietors and is not intended for consumers. If you enroll in the Beta Program, you are enrolling as a business, not as an individual consumer. If you have an existing contract with Overture to distribute any Overture paid listings, you are not eligible to enroll in the Beta Program unless Overture consents to your participation in writing, ahead of time.

You and Overture agree to the following:

1. Definitions:
    a. **Ad Unit:** the unit served by Overture that contains Matched Ads and/or other content.
    b. **Ad Page:** Your RSS Feed(s) and the pages within Your Site, as applicable, in each case, on which Matched Ads appear.
    c. **Ad Code:** the JavaScript code (or any other form of specified code) placed in an Ad Page that initiates a request for Matched Ads when a user transfers to an Ad Page.
    d. **Matched Ads:** the content of Advertisers that is served from Overture's paid marketplace databases in response to a Query generated from the Ad Code.
    e. **PayPal System:** the online system operated by PayPal, Inc. an eBay Company, that enables any individual or business with an email address to send and receive payments online.
    f. **Policy or Policies:** the policies posted at https://publisher.yahoo.com/legal/prog_policy.php and any other policies that we make applicable to the Beta Program.
    g. **Query:** a request for Matched Ads initiated by the Ad Code on an Ad Page.
    h. **RSS or Atom:** an XML format most commonly used for syndicating content such as news and other reverse-chronologically ordered web sites like blogs, which, for purposes of this Agreement, shall include any other similar text-based formats used for syndicating content. For purposes of this Agreement, a reference to either such term shall include the other.
    i. **You or you:** the entity that is enrolling in the Beta Program.
    j. **Your RSS Feed(s):** the RSS feeds that You own that include the Ad Code.
    k. **Your Site:** the web site(s) or other internet based media distribution platform, including without limitation RSS Feeds, email, Instant Messaging, or any other technology now existing or developed in the future, that You own that contain webpages that include the Ad Code.
2. **Ad Units.** After we receive a Query, we will use commercially reasonable efforts to provide an Ad Unit to Your Site and/or Your RSS Feed, as applicable.
3. **Your Responsibilities.**
    a. You agree to comply with Overture's Policies and any other policies or requirements we establish from time to time.
    b. You are responsible for obtaining all equipment, web access and connections necessary for you to participate in the Beta Program and for (i) hosting Your Site and (ii) hosting, managing and syndicating Your RSS Feed, as applicable, in each case, at your own expense.
    c. You are responsible for proper configuration of Your Site and/or Your RSS Feed to include the Ad Code and to receive Ad Units, and for meeting all other technical requirements necessary to use the Beta Program services.
    d. You agree to notify Overture of any disputed or missing payment within thirty (30) days of the date that payment is or should have been received. You understand that you will have waived the right to dispute the accuracy or receipt of payment after that time.
4. **Implementation.** If there is any conflict between these implementation requirements and a Policy, you should comply with the Policy instead, but only to the extent of the conflict.
    a. You agree to allow your Ad Pages to send Overture a Query each time that a user navigates to an Ad Page, and you agree not to send additional Queries until the user refreshes the Ad Page or navigates to a new Ad Page. You acknowledge that we may suspend services under this Agreement in the event we detect a spike in the number of Queries from Your Site or Your RSS Feed; and
    b. You agree that you will: (i) not modify the Ad Unit in any way; (ii) display the Ad Unit at the same time that you display the other content on the Ad Page; and (iii) not change the content or the order of the Matched Ads or any other content within the Ad Unit. You understand that we may modify the content, look and feel, and any other aspect of the Ad Unit from time to time, in our sole discretion.

c. You agree that you will not distribute from or promote on Your Sites or Your RSS Feeds any software application that is (or may reasonably be construed as) spyware, adware or trackware.

5. **Exclusivity.** For any webpage or RSS feed that includes the Ad Code, you agree not to display or link to any other advertising (including but not limited to any listing) that is mapped to or responds to the content of the Ad Page.

6. **Payment.**

   a. Overture's payment to you will be based on the net revenue earned by Overture from the Matched Ads displayed on Your Site and/or Your RSS Feed(s) to human users within the United States.

   b. We will determine the quality and validity of traffic, clicks and impressions from Your Site and/or Your RSS Feed(s) and will calculate payment in our sole discretion, solely on the basis of the information we record or collect. We will not pay you for any amounts generated in violation of these Terms or a Policy.

   c. Each time that we send you a payment, we incur administrative and other costs. For this reason, we will not send you a payment if the amount owed to you is less than $100, unless you have elected to be paid via the PayPal System implementation available on the Beta Program. In the event you have elected to be paid utilizing the PayPal System, we will send you a payment if the amount owed to you is $50, or more. If your participation in the Beta Program terminates, we will exercise commercially reasonable efforts to send you a final payment if the amount owed to you exceeds $100, unless you have elected to be paid utilizing the PayPal System, in which case we will send you a payment if the amount owed to you is $50, or more. We reserve the right to offset any amount owed to you by the amount of Overture's damages if we terminate for cause.

   d. As much as we would like to, we cannot pay you if we do not have your correct payment and contact information or if you modify the Ad Code in any way. Payment is contingent on your keeping us updated with current and accurate payment and contact information including, without limitation, valid tax payer identification number or social security number, and valid bank account information, to the extent you elect payment by direct deposit before the time that payment is due and on your using the Ad Code correctly. We reserve the right to terminate this Agreement in the event that we are unable to verify the accuracy or validity of any of the foregoing.

   e. If you are an advertiser with Overture, we may offer you the ability to transfer your Beta Program balance to your advertiser account. We may change the terms applicable to such transfers at any time, in our sole discretion. Please note that any balance you carry in your Beta Program account will not relieve you of your obligation to pay the balance in your advertiser account. Once you transfer an amount from your Beta Program account to your advertiser account, you will not be able to transfer those funds back into your Beta Program account. If you have notified Overture that you are subject to withholdings or if the Internal Revenue Service has notified Overture of a requirement to withhold taxes, you will not be able to transfer your balance to an advertising account.

   f. You will be responsible for all taxes and governmental fees of any kind that are imposed on or arise out of your participation in the Beta Program.

   g. We may offset any payment by (i) any amount you owe to Overture, its parent company and its subsidiaries and affiliates; and (ii) any fees or charges that result from your failure to provide Overture with accurate payment information or your failure to update your information.

7. **Changes and Updates.** Overture needs to have the freedom to make strategic and business decisions about the Beta Program (and all related and successor programs). For this reason, we reserve the right, in our sole discretion, to change all or part of these Terms and/or the Policies and to change or discontinue the Beta Program, including but not limited to raising or lowering the rate of compensation, changing the basis of compensation and/or changing the payment schedule. We may make these changes at any time, with or without notice. Your continued participation in the Beta Program will constitute your acceptance of the then-current terms and conditions, Policies and service offerings. You are responsible to check for updates. Changes and updates to these Terms will be effective immediately after they are posted at: https://publisher.yahoo.com/legal/tnc.php.

8. **Feedback.** We will own and have the sole right to use any ideas, information, understandings, and concepts derived from your evaluation of the Beta Program or any other suggestions or information you disclose, without restriction and without compensating you in any way. If we request it, you will reasonably cooperate to provide Overture with your evaluation of the Beta Program.

9. **Your Representations, Warranties and Ongoing Obligations.** As of the date that you enter into this Agreement and for as long as you participate in the Beta Program, you represent warrant and covenant that:

   a. you are a business and you are participating in the Beta Program as a business;

   b. if you are a sole proprietor, you are 18 years old or older; if you are an entity, you are a corporation, partnership or other legal entity duly formed and in good standing;

   c. you are (i) the registered owner of Your Site, including the domain name, and/or (ii) the owner of Your RSS Feed, including all content contained therein;

   d. you have all the legal rights needed to enter into and perform your obligations under this Agreement;

   e. you have read and understand the Policies and you understand that your participation in the Beta Program is contingent on your compliance with those Policies and that violation of a Policy will constitute a material breach of this Agreement;

   f. whenever you provide information to Overture, you will provide true, accurate, current and complete information and you will update Overture if the information changes;

   g. you are a US-based business and you are operating Your Site and/or Your RSS Feed solely for viewing and use by users within the US; and

   h. you will abide by all applicable laws, rules and regulations and you will not display or use any content that would infringe the rights of any third party (including but not limited to rights under contract, copyright or trademark law).

    i.  (i) if you are a sole proprietor, and you are an employee of Yahoo!, or (ii) if you are an entity that is owned by an employee(s) of Yahoo!, you are participating in the Beta Program in compliance with Yahoo!'s internal policies.

    j.  You will not register or use any domain names containing 1) any Yahoo! or Overture trademark, or 2) any string that in Overture's sole opinion is confusingly similar to any Yahoo! or Overture trademark.

10.  **Your Acknowledgments.** You acknowledge that:

    a.  for Ad Pages receiving dynamic mapping, we will begin providing Matched Ads only after the dynamic mapping engine has had an opportunity to scrape the Ad Page;

    b.  if we make filtering functionality available, we make no warranty that any filter will prevent the display of any particular listing, content or language;

    c.  all right, title and interest in the content we provide to you (including but not limited to the Matched Ads), the Overture and Yahoo! trademarks, and the Beta Program (including but not limited to all technology and processes involved in the Program) are exclusively owned by Overture, Yahoo! Inc. and/or their licensors. We reserve any rights not expressly granted in this Agreement and disclaim all implied licenses;

    d.  you are participating in the beta stage of the Yahoo! Publisher Network online program. At the conclusion of the Beta Program, we may transition your account into the generally available version of this program and you will be subject to the terms and conditions and policies governing that program unless you terminate your participation; and

    e.  you may receive a promotional rate of compensation for your participation in the Beta Program and that we reserve the right to alter this rate at any time.

11.  **Abuse of Services.** You agree not to:

    a.  add to, subtract from or modify the Ad Unit or the Matched Ads in any way (including making changes to the order of the Matched Ads or any information within the Matched Ads, making changes to any trademark, or making changes to notices included in the Ad Unit (e.g., copyright and trademark notices));

    b.  strip, modify or filter the Matched Ads in whole or in part;

    c.  frame any webpage that is not within Your Site or Your RSS Feed, as applicable;

    d.  cache Ad Units or Matched Ads;

    e.  give users of Your Site or Your RSS Feed or anyone else any kind of encouragement or incentive to click on Matched Ads, including but not limited to language directing users to click on the Matched Ads or informing users that they can support Your Site or Your RSS Feed by clicking on the Matched Ads;

    f.  display any content that would alter or obscure the appearance of the Matched Ads or any other content in the Ad Unit;

    g.  use, authorize or enable any automated means of generating impressions or clicks on Matched Ads or any manual means of generating fraudulent or invalid impressions or clicks, or any other means designed to increase the payment due under this Agreement;

    h.  click on the Matched Ads;

    i.  display any webpage as an alternative to the webpage accessed by clicking on a Matched Ad (including but not limited to displaying an additional instance of the same advertiser page that is displayed by clicking on the Matched Ad) or redirect users who have clicked on a Matched Ad;

    j.  display all or part of the Ad Unit on any web site or RSS feed that is not owned by You, or sublicense or syndicate the Matched Ads to any other entity, RSS feed or web site;

    k.  display all or part of the Ad Unit on or through any email or software application, or use any software application that is downloaded onto user computers to drive traffic to Your Site or Your RSS Feed;

    l.  display all or part of the Ad Unit to any user located outside the US;

    m.  sign up for more than a single Beta Program account; or

    n.  modify the Ad Code, the Query, or any other Ad Codes, tags and other programming or tracking information provided to you by Overture.

12.  **No Other Licenses.** You are authorized to display the Ad Unit exactly as it is provided by Overture. You are receiving no other license to use or modify the Ad Unit, the Matched Ads, any Yahoo! trademark, or any other content provided by Overture.

13.  **Grant of Rights to Overture.** Notwithstanding anything in any Yahoo! Search Marketing or other Yahoo! privacy policy, terms of service or any other document, you grant Overture, Yahoo! Inc., and all Overture and Yahoo! affiliates and subsidiaries ("Related Parties") the following:

    a.  the right to disclose your personal and business information to third parties (a) to the extent necessary to determine your eligibility for the Beta Program, and (b) with its agents, accountants, attorneys, contractors and other representatives for Overture's business purposes;

    b.  the right to include your information in combination with information from other Overture publishers and disclose such aggregated information to any third party;

    c.  the right to receive and share any and all of the information you disclose or make available (including but not limited to information generated by your participation in the Beta Program) with and between the Related Parties;

    d.  the right to use your information for any internal business purpose; and

    e.  the right to crawl, copy, index or otherwise use the content of Your Site and/or Your RSS Feed(s), as applicable.

14.  **Reserved Rights.** In addition to any right not explicitly disclaimed or waived by Overture, we reserve the right to:

    a.  investigate you, Your Site, Your RSS Feed(s), your owners, officers, directors, agents, contractors and employees, at any time;

    b. change or discontinue the Beta Program, in whole or in part and temporarily or permanently, without notice and without liability to you or any third party; and

    c. provide Ad Units that contain content other than "pay for performance" advertisements, including, but not limited to, Ad Units that contain advertisements or links to Overture or Yahoo! services, charitable or non-profit organizations, blog posts, blog search results and web search results, without including such advertisements, links or results in the basis for payment under this Agreement, even if we receive payment for them.

15. **Termination.**

    a. **By You.** You may terminate any of Your Sites' or Your RSS Feeds' participation in the Beta Program at any time by removing the Ad Code from that web site or RSS feed. Upon your termination, we may but do not have to immediately stop providing Matched Ads to Your Site or Your RSS Feed. If you place the Ad Code back on Your Site or Your RSS Feed, you will be subject to the then-current Terms and Policies.

    b. **By Overture.** We may suspend or terminate our provision of Matched Ads to you at any time, with or without notice, for any reason or no reason, with or without regard for how well Your Site or Your RSS Feed is performing, the quality of user traffic coming from Your Site or Your RSS Feed, or any other factor, in Overture's sole discretion.

16. **Indemnity.** You will defend, indemnify and hold harmless Overture, its parent and affiliated companies, and its advertisers ("Indemnified Parties") from and against any and all claims, liabilities, losses, costs, and expenses, including reasonable attorneys' fees, which the Indemnified Parties suffer as a result of claims that arise from or relate to your activities under or in connection with this Agreement, including but not limited to claims that allege or arise from: (i) a violation a third party's right of privacy, or infringement of a third party's copyright, patent, trade secret, trademark, or other intellectual property rights, (ii) any breach of your obligations, covenants, warranties or representations as set forth in this Agreement, including any breach of any applicable policies, (iii) any violation of applicable laws, rules, and regulations by you, including, without limitation, privacy laws, and (iv) any breach of this Agreement. You shall not enter into any settlement that affects any Indemnified Party's rights or interest, admit to any fault or liability on behalf of any Indemnified Party, or incur any financial obligation on behalf of any Indemnified Party without that Indemnified Party's prior written approval.

17. **No Warranty.** YOU EXPRESSLY AGREE TO THE FOLLOWING WARRANTY DISCLAIMER. YOU ARE ENROLLING IN THE BETA PROGRAM AT YOUR OWN RISK. THE BETA PROGRAM AND EVERYTHING OVERTURE PROVIDES UNDER THIS AGREEMENT IS PROVIDED "AS IS." OVERTURE DOES NOT WARRANT THAT THE BETA PROGRAM WILL OPERATE UNINTERRUPTED OR ERROR-FREE. OVERTURE, YAHOO AND THEIR LICENSORS ARE NOT RESPONSIBLE FOR ANY CONTENT PROVIDED HEREUNDER OR FOR ANY SITE THAT CAN BE LINKED TO OR FROM THE MATCHED ADS. TO THE EXTENT ALLOWED BY LAW, OVERTURE, YAHOO AND THEIR LICENSORS MAKE NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NONINFRINGEMENT. OVERTURE MAKES NO WARRANTY AND NO REPRESENTATION ABOUT THE RESULTS YOU WILL OBTAIN THROUGH THE BETA PROGRAM, INCLUDING BUT NOT LIMITED TO ANY REPRESENTATION REGARDING THE AMOUNT OF MONEY YOU WILL EARN THROUGH THE PROGRAM. This warranty disclaimer shall apply to the maximum extent permitted by law.

18. **Limitation of Liability.** YOU EXPRESSLY AGREE TO THE FOLLOWING LIMIT OF LIABILITY. OVERTURE WILL NOT BE LIABLE FOR ANY LOST PROFITS, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY OTHER INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, HOWEVER CAUSED, AND UNDER WHATEVER CAUSE OF ACTION OR THEORY OF LIABILITY BROUGHT, EVEN IF OVERTURE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. OVERTURE WILL NOT BE LIABLE FOR DIRECT DAMAGES IN EXCESS OF ANY AMOUNT THAT OVERTURE HAS ALREADY PAID YOU DURING THE 6 MONTHS PRIOR TO THE TIME THAT THE CAUSE OF ACTION AROSE. IF YOU ARE DISSATISFIED WITH ANY ASPECT OF THE BETA PROGRAM, OR WITH ANY OF THESE TERMS OF USE, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE YOUR PARTICIPATION IN THE BETA PROGRAM. This limitation of liability shall apply to the maximum extent permitted by law.

19. **No Public Statements.** You may not issue any press release or other public statement regarding the Agreement, Yahoo! Search Marketing, Overture, Yahoo! and/or Overture's or Yahoo! Inc.'s affiliates, or partners or advertisers without the prior written consent of an authorized person at Overture.

20. **Other Claims.** Nothing in this Agreement will be construed to waive or prejudice Overture's ability to assert any cause of action against you or any third party. For example and without limitation to any other causes of action, if you engage in any action that constitutes an infringement of Overture's copyrighted materials, we may pursue a claim for that infringement even though the infringing action was not prohibited in this Agreement. In addition, for any breach of this Agreement or the Policies, we reserve the right to pursue all available civil and criminal remedies in addition to our contractual remedies.

21. **Confidentiality.** You will not disclose or use Overture's Confidential Information. "Confidential Information" means any information disclosed or made available to you by Overture, directly or indirectly, whether in writing, orally or visually, other than information that: (a) is or becomes publicly known and generally available other than through your action or inaction or (b) was already in your possession (as documented by written records) without confidentiality restrictions before you received it from Overture. Confidential Information includes but is not limited to all information contained within Overture's reporting systems, the Ad Code, these Terms, the Policies, click-through rates and other performance metrics and any other technical or programming information Overture discloses or makes available to you.

22. **Misc.**

    a. These Terms apply only to Overture's provision of Matched Ads to you through the Yahoo! Publisher Network Beta Program. Any other Overture or Yahoo! products or services will be governed by the different terms of service applicable to such specific products or services, including any existing contract between you and Overture.

    b. Overture reserves the right to refuse to provide services to anyone, for any reason or no reason, in Overture's sole

discretion.

c. This Agreement will be governed by the laws of California, excluding its conflicts of laws principles. Any dispute or claim between you and Overture, Yahoo! or their affiliates and subsidiaries will be adjudicated in the state or federal courts in Los Angeles County, California. Any claim against Overture arising from the Agreement shall be adjudicated on an individual basis, and shall not be consolidated in any proceeding with any claim or controversy of any other party.

d. You agree to file any claim or cause of action against Overture within one (1) year of the date that the claim or cause of action arises.

e. This is the entire agreement between you and Overture with regard to the subject matter covered herein. Any other terms and agreements (whether verbal, written or both) are superseded.

f. A party can only waive rights under this Agreement by executing a written waiver signed by a duly authorized representative. No other action or inaction will constitute a waiver.

g. The following sections will survive termination of this Agreement: 1, 3d, 5, 6, 8, 9, 10, 11, 13, 14, 16, 17, 18, 19, 21 and 22.

h. The parties are independent contractors. This Agreement does not form any joint venture, partnership, agency or employment relationship.

i. Except for your indemnity obligations, there are no third party beneficiaries to this Agreement.

j. You may not assign, resell, or delegate this Agreement or any of your rights or duties under this Agreement, even if you sell or transfer Your Site and/or Your RSS Feed(s). Any attempted assignment, resale or delegation will be void.

k. Overture may assign this Agreement or delegate its responsibilities without your consent. Upon assignment, Overture will have no further obligation or liability under this Agreement.

l. Overture may change any or all aspects of Overture's and Yahoo!'s products, services or marketplaces, including the Beta Program, at any time and without notice. Nothing in this Agreement will constrain how Overture and Yahoo! operate their businesses.

Copyright © 2008 Yahoo! Inc. All rights reserved.
Privacy Policy | Terms of Service | Terms and Conditions | Help Center

2/3/2008

 **SEARCH MARKETING**

## GENERAL TERMS AND CONDITIONS FOR YAHOO! SEARCH MARKETING ADVERTISERS

**1. INTRODUCTION:** Overture is a SAS (société par actions simplifiées), with capital of 37,000 euros, recorded in the Paris Commercial Register under number B 442 044 087. The head office of Overture is at 17-19 rue Guillaume Tell, 75017 Paris (France); and it is part of the Yahoo! Group (hereinafter **"Yahoo! Search Marketing"**). The purpose of these general terms and conditions (**"General Terms and Conditions for Advertisers"**) is to define the legal, technical and financial conditions of the product and/or services offering applied by Yahoo! Search Marketing to advertisers, and/or to intermediaries acting for and on behalf of advertisers (**"Proxy Agency(ies)"**) (collectively referred to as **"Client(s)"**), so that their advertising campaigns in French language and aimed at France will be circulated on the advertising spaces of the Yahoo! Search Marketing Network and their conditions of use (**"Yahoo! Search Marketing Services"**). Barring express agreement by written mutual consent between Clients and Yahoo! Search Marketing, and subject to advance, written agreement from Yahoo! Search Marketing, any Insertion Order submitted by Clients to Yahoo! Search Marketing shall automatically signify Clients' adherence to these conditions, which Clients acknowledge that they have read, understood and accepted, notwithstanding any clause to the contrary in any document of Clients, specifically in their commercial documents, and any prior oral or written undertaking or commitment. Terms written with an initial capital letter that are not defined in this introduction are defined below.

**2. DESCRIPTION OF YAHOO! SEARCH MARKETING SERVICES:**

**2.1.** Clients' advertisements are displayed in the form of sponsored hypertext links composed of a title and a description of the product or service that is being offered by the advertiser and/or graphic elements (**"Description"**), and a URL that refers users directly or indirectly to the advertiser's site (hereinafter referred to jointly as the **"Sponsored Links"**) on the Yahoo! Search Marketing site http://searchmarketing.yahoo.fr and/or the partner sites of Yahoo! Search Marketing (hereinafter collectively **"Yahoo! Search Marketing Network"**).

**2.2.** By using Yahoo! Search Marketing Services, Clients agree that their Sponsored Links will be displayed:

- As the result (i) of a search done by web surfers in an on-line search box (**"Precision Match™"** or **"Sponsored Search"**); (ii) as the result of prior activation by web surfers of a thematic hypertext link (consisting of a specific term or word) offered by Yahoo! Search Marketing on those sites (**"Hot Spot"**); (iii) whenever the web page is loaded (**"Content Match™ or "Context Links""**). Clients have the capability at any time to stop their Sponsored Links from being displayed also as Context Links specifically through the *"Manage my account"* interface (Click here for more information on the "Manage my account" interface).

- Depending on the key word(s) pre-selected and as set out in article 4, and/or any other key word equivalent to the one already determined in order to pick up, in web surfers' searches, i) spelling errors and typos, singular/plural, feminine/masculine combinations (e.g. if a Client is the high bidder for the key word "diamond ring," his Sponsored Link will appear for the search "diamond rings") as well, ii) phrases (e.g. if a Client is the high bidder for the key word "diamond ring," his Sponsored Link will also appear for the search "buy a diamond ring"), iii) additional words ("diamond wedding ring"), iv) queries in a different order ("diamond and gold ring") or Description. Clients may at any time stop their Sponsored Links from being displayed as the result of a broad target query, by using the "Manage my account" interface.

- Depending notably on the price bid that the Client will have made to pay to Yahoo! Search Marketing at each click by a web surfer on their Sponsored Link(s), by decreasing order of price per key word and in the number of links available on each Yahoo! Search Marketing Network Partner Site; accordingly Sponsored Links of Clients who have made too low a bid might not be displayed depending on the conditions of the partner sites. Yahoo! Search Marketing constantly adjusts the price bid of a Client on a key word depending on the bids of other Clients, without ever exceeding the maximum bid set by the Client. A minimum

difference of 0.01 euro (€) is required between two Sponsored Links. So a Client must outbid the next closest bid by at least 0.01 € in order for his Sponsored Link to appear before his competitor's link. Nonetheless, the Client agrees that the positioning (ranking) and/or the order of its Sponsored Links could be modified and/or reorganized by Yahoo! Search Marketing according to other criteria and in particular in order to improve the performance of the aforesaid Sponsored Links on a given Web page of Yahoo! Search Marketing Network. Clients acknowledge and accept that the displaying of their Sponsored Links on the Network will also vary depending on the media or partner sites.

- In an advertising space of the Yahoo! Search Marketing Network and integrated into all or part of that network, without their being able to choose one or the other of the partner sites of that network. Clients also acknowledge that, primarily for reasons of maintenance, updates or technical improvements during the circulation of their advertising campaigns, the Yahoo! Search Marketing Network is subject to change during the circulation of their advertising campaign. Clients accept the consequences of that, and specifically agree to appear on any new partner site of Yahoo! Search Marketing and/or to disappear from any old partner site during the circulation of their advertising campaign, and Yahoo! Search Marketing may not be held liable on any grounds.

- If necessary, in a shortened or truncated form and/or that the size as well as the format of the Descriptions and/or the Sponsored Links could be modified, and this on whole or part of the Yahoo! Search Marketing Network, so in particular in order to allow a setting of these Descriptions and/or Sponsored Links in conformity with the rules applicable to the partners' websites composing the Yahoo! Search Marketing Network.

**2.3.** To be able to use Yahoo! Search Marketing Services, each Client must (i) determine the list of key words that will lead web surfers to its Sponsored Link(s) (see article 3.2), (ii) develop its Sponsored Link and specifically its Description (see article 3.3), (iii) set the budget that it wants to allocate to its advertising campaign(s) (see article 5), (iv) have a Yahoo! Search Marketing account (see article 5), (v) fill out an advertisement insertion order or renewal order. The Client must fill out and send the advertisement insertion order (hereinafter **"Insertion Order"**) to Yahoo! Search Marketing either: by email, fax or postal mail. If, for making the purchase of advertising space and execution of its Insertion Orders, the Advertiser uses the services of a Proxy Agency, that Proxy Agency must fill out an Insertion Order and include with that Insertion Order an agency attestation on the advertiser's letterhead stationery duly filled out and signed. The Client states that all the information that it provides for its registration and payment (especially by bank card and/or transfer) is complete and accurate. The Client acknowledges that Yahoo! Search Marketing shall be the sole arbiter of whether or not the campaign gets put on line.

**3.** **SUBMISSION OF KEY WORDS AND SPONSORED LINKS:**

**3.1.** Prior to their circulation, Clients communicate the Sponsored Links (URL, Titles and Descriptions) and the associated key words to Yahoo! Search Marketing, either: on line at the site http://searchmarketing.yahoo.fr (on the on-line registration form at the address https://signup.overture.com/s/dtc/signup/?market=fr), by file transfer protocol, by email, fax, postal mail, or telephone or, if there is a modification of a Sponsored Link, using the "*Manage my account*" interface located at the address https://secure.overture.com/login.do?mkt=uk&locale=en_GB.

**3.2** The key words chosen by Clients and for which they wish to make a per-click price bid must be (i) chosen in observance of the editorial and propriety rules established by Yahoo! Search Marketing (*click here for more information about the propriety rules applicable to key words*) and (ii) pursuant to the applicable laws and regulations and not infringe third-party rights (see article 10 "Representations and Warranties of Client".). Clients expressly acknowledge that the service entitled "*See key words searched*," which is available at the site http://searchmarketing.yahoo.fr, is a simple statistical tool that lets one find out the main queries associated with the key word selected during the previous month, and that it does not give Clients any right to use those key words to identify the Sponsored Link(s) and/or the content of the web sites of the Clients that they are promoting.

**3.3** The Sponsored Links, and specifically the Description written by the Clients must comply with (i) the editorial rules and rules of propriety established by Yahoo! Search Marketing (*click here for more information about editorial*

*rules and rules of pertinence applicable to Sponsored Links),* (ii) the applicable laws and regulations and not infringe third-party rights (see article 10 "Client's Representations and Warranties".)

3.4    Clients are authorized, at any time, to eliminate key words from their list of key words and/or to suspend their Sponsored Links, by connecting to the "Manage my account" interface *(click here for more information).* Yahoo! Search Marketing also reserves the right to eliminate and/or suspend temporarily or permanently key words and/or Sponsored Links if they do not conform to what is agreed in articles 4 "Editorial Control" and 10 "Client's Representations and Warranties."

4.    EDITORIAL CONTROL: Yahoo! Search Marketing reserves the right, at any time (before or after the Client advertising campaign is put on line) at its sole discretion (i) to refuse and/or withdraw any key word, Description and/or Sponsored Link especially if they fail to follow the editorial directives or other Yahoo! Search Marketing procedures or if they violate the applicable laws and regulations and infringe third-party rights; such refusal shall not engender for the Client any right to any compensation of any sort; (ii) to suggest any modifications to bring them into compliance with the aforementioned directives, procedures, laws and regulations; however, the decision to implement any proposal and/or suggestion of modification shall lie with the Client, which shall be responsible for its key words, Url's, Titles and Descriptions and more generally for its Sponsored Links. The Editorial Control exercised by Yahoo! Search Marketing shall not concern the availability of the key words used for putting the Sponsored Link on line. Such Editorial Control shall not release the Client, which shall bear sole editorial responsibility.

5.    OPENING AND ACCESS TO YAHOO! SEARCH MARKETING ACCOUNT: Yahoo! Search Marketing shall, at its sole discretion, create a client account upon receipt of an effective initial minimum deposit required by Yahoo! Search Marketing for all Clients. The initial deposit shall be credited to its account. Each account created shall be subject to the effective billable monthly minimum amount *(Click here for more information on the effective billable minimum monthly amount).* The Yahoo! Search Marketing account shall be credited whenever a payment is made by the Client, and debited according to the methods of payment described in article 4.3 hereinafter. The right to access the Yahoo! Search Marketing account shall be personal and inaccessible. Any access to the Client's Yahoo! Search Marketing account shall be assumed to be by the Client. The Client shall keep confidential all information enabling access to the Yahoo! Search Marketing account. Yahoo! Search Marketing refuses any liability for the consequences of fraudulent access or access by an unauthorized person. Access to the Yahoo! Search Marketing account must be used exclusively manually. Therefore, Clients agree not to access it or to use it with automatic means (such as agents, robots, scripts, web crawler …) without express advance authorization from Yahoo! Search Marketing. The Yahoo! Search Marketing websites contain technical devices for blocking robots. Clients are prohibited from using processes to circumvent those devices. Clients further agree to avoid any action that might hinder the proper functioning of the Yahoo! Search Marketing websites, especially by imposing an excessive load on the computer infrastructure of Yahoo! Search Marketing.

6.    MANAGEMENT OF CLIENT ADVERTISING CAMPAIGNS:

6.1.    Clients may manage their accounts, advertising campaigns and price bids, either directly on line through the "*Manage my account*" interface, or with assistance from a Yahoo! Search Marketing manager (hereinafter "Account Manager") subject to an effective minimum budget commitment and minimum monthly expenditure required by Yahoo! Search Marketing for all Clients *(click here for more information).*

6.2.    Clients who manage their accounts, advertising campaigns and price bids through an Account Manager may choose one of the following 3 (three) budget management methods:

- A maximum total budget for the entire duration of their advertising campaigns as stated in the Insertion Order. Once the budget amount is reached, Yahoo! Search Marketing may, with no right to compensation for the Client, suspend the circulation of its advertising campaigns before the campaign end date. The Client's Yahoo! Search Marketing account shall then be inactive. The client may check the number of days left in its account accessible through the "*Manage my account*" interface so that it can send Yahoo! Search Marketing a Renewal Order (hereinafter "Renewal Order") to resume circulation of its campaign on the

Yahoo! Search Marketing Network.

- A **maximum total budget for the entire duration of their advertising campaigns indicated in the Insertion Order, with a maximum monthly budget**. Once the monthly budget amount is reached, Yahoo! Search Marketing may suspend, with no right to compensation for the Client, the circulation of the advertising campaign(s) during the month or day in progress, and resume it on the 1st day of the next month, up to the total duration indicated on the Insertion Order. The Client's Yahoo! Search Marketing account will then be inactive. The client may check the number of days remaining in its account accessible through the "*Manage my account*" interface so that it can send Yahoo! Search Marketing a Renewal Order (hereinafter "**Renewal Order**") once its maximum total budget is reached, so that the circulation of its campaign on the Yahoo! Search Marketing Network can be resumed.

- A **monthly maximum budget with no limitation of duration**. Once the monthly budget amount has been reached, Yahoo! Search Marketing may suspend, with no right to compensation for the Client, the circulation of the advertising campaign for the month in progress, and resume it the next month or the next day. The Client's Yahoo! Search Marketing account will be inactive for the duration of the suspension.

6.3. Clients who manage their accounts, their advertising campaigns and their price bids directly on line through the "*Manage my account*" interface may suspend or resume their campaigns directly on the "*Manage my account*" interface. The duration of their campaigns depends on the payment plan chosen (see article 7.4 below).

## 7.  PRICE AND PAYMENT:

**7.1.  Price:** The minimum click-through price per key word bid by the Clients may not be less than the effective minimum amount required by Yahoo! Search Marketing for all its Clients *(click here for more information)*.

**7.2.  Professional Discount:** Yahoo! Search Marketing grants a discount to advertisers who want to put Sponsored Links on line for them to be circulated in France, and who resort to the services of a Proxy Agency for the purchase of their online advertising spaces and the performance of their Insertion Orders.

**7.2.1.  Conditions for the granting of the professional discount:** The professional discount is granted to advertisers whose Proxy Agency:
i)      complies with the requirements specified in clause 7.2.2. of the present article;
ii)     complies with the conditions in relation to the turnover specified in clause 7.2.4. of the present article;
iii)    carries out the management, the follow up and the supervising of the performance of the Insertions Order and of the payment of the invoices;
iv)      complies or insures that the advertisers comply with the time limit for payment of the invoices as required in present General Terms and Conditions.

The professional discount is granted to all the "advertisers' accounts" of the Proxy Agency or of the Proxy Agency Group, excluding the advertisers who have subscribed to a prepaid payment Plan.

**7.2.2.  Qualified Proxy Agency:** Every Proxy Agency will have to provide beforehand to Yahoo! Search Marketing the duly filled in certificate of mandate signed by Proxy Agency and the advertiser, as provided by the Act n°93-122 of 29 January, 1993 on the purchase of advertising spaces ("Sapin Act"). Yahoo! Search Marketing reserves the right to refuse the professional discount to any Proxy Agency who fails to submit a minimum of three active proxies in relation to Yahoo! Search Marketing in favour of legally independent entities and if the APE code of the Proxy Agency does not correspond to the one reserved for agencies engaged in the business of purchasing advertising space and/or if the Proxy Agency does not meet the conditions required by the Sapin Act.

**7.2.3  Calculation base of professional discount:**

a) Definitions:
**"Proxy Agency Group"**: group composed of legal entities that are in particular engaged in the purchase of

advertising spaces, directly or indirectly controlled as defined in Article L233-3 of the French Commercial Code, by the holding company of the group that the Proxy Agency belongs to.

**"Quarterly Turnover"**: total of gross sums before tax invoiced for the broadcast of Sponsored Links aiming France i) during a three-months period beginning four months before the current civil quarter, ii) by Yahoo! Search Marketing to all the advertisers represented by the Proxy Agency or by the Proxy Agency Group, iii) for the Valid Clicks.

**"Valid Click(s)"**: Click(s) registered by Yahoo! Search Marketing in compliance with the conditions of Article 7.3 hereafter, except for clicks that were registered by error or that are invalid clicks.

b) Principle: The professional discount is applied on a quaterly basis and reassessed at the end of each civil quarter, according to the Quarterly Turnover amount that is made by the Proxy Agency or by the Proxy Agency Group.

c) The belonging of a Proxy Agency to a group: If the Proxy Agency belongs to a group of agencies, the rate of the professional discount shall be calculated according to the Quarterly Turnover made by the group, except for Clients who subscribed to a prepaid payment Plan. The rate obtained shall be applied to the group of advertisers represented by the Proxy Agency or the Proxy Agency Group.

The calculating method mentioned hereinabove shall be applied subject to:
- The legal representative of the Proxy Agency Group and the legal representative of the Proxy Agency having sent to Yahoo! Search Marketing a joint certificate confirming that they belong to the same group. This certificate shall be established in accordance to the specimen drafted by Yahoo! Search Marketing. This model is available on simple request made to Yahoo! Search Marketing's commercial department,
- Yahoo! Search Marketing having not challenged the above certificate,
- The Proxy Agency actually belonging to the group at stake from the first day to the last day of the invoiced quarter.

**7.2.4. The professionnal discount rate:** This rate is equal to:
- 12% of the gross amount before tax invoiced to the advertisers, if the Quaterly Turnover made by the Proxy Agency or by the Proxy Agency Group is equal to or exceeds 750 000 euros gross before tax;
- 8 % of the gross amount before tax invoiced to the advertisers, if the Quaterly Turnover made by the Proxy Agency or by the Proxy Agency Group is situated between 100 000 and 749 999 euros gross before tax;
- 4 % of the gross amount before tax invoiced to the advertisers, if the Quaterly Turnover made by the Proxy Agency or by the Proxy Agency Group is equal to or inferior to 99 999 Euros gross before tax.

**7.2.5. Miscellenaous:** The Proxy Agency guarantees that the professional discount is applied in compliance with the provisions of the Sapin Act.

Without prejudice of its other rights, Yahoo! Search Marketing reserves the right to claim the reimbursement of any unjustified professional discount and particularly in the event the Proxy Agency does not fulfil the conditions required in Article 7.

**7.3. Billing:** The amounts billed to Clients result from multiplying the number of clicks recorded by Yahoo! Search Marketing on all the Client's Sponsored Links, by the price per key word recorded by Yahoo! Search Marketing at each web surfer's click (up to the maximum bid of the price per key word indicated by the Client). Clients acknowledge and accept that all click statistics recorded by Yahoo! Search Marketing on the Sponsored Links will serve as official, contractual and definitive data between Yahoo! Search Marketing and the Clients. Each month, Yahoo! Search Marketing shall send to advertisers and their respective Proxy Agencies a bill for the Valid Clicks recorded during the previous month. The Client must submit in writing to Yahoo! Search Marketing any claims or disputes as to any amount billed to the account, within 60 days as of that billing; otherwise, the Client shall be considered to have dropped that claim or dispute and the billing in question shall become final and unappealable. Clients who manage their accounts, their advertising campaigns and their price bids directly on line through the *"Manage my account"* interface have access to bills through the *"Manage my account"* interface.

**7.4  Payments and payment plans:**

Clients agree to pay Yahoo! Search Marketing in euro the amount debited from their account plus all applicable taxes, if any, in accordance with the applicable payment terms and/or payment plans, as well as any invoicing terms then in force.

Payments shall be made monthly by check or by wire transfer (the corresponding expenses being borne by the Client), within 30 days of the invoice receipt date as regards accounts in respect of which campaign purchases are made directly from Yahoo! Search Marketing and within 60 days as regards accounts in respect of which campaign purchases are made through a Proxy Agency.

As regards Clients opening their account on line on http://searchmarketing.yahoo.fr, payments shall be made by check, bank card or direct debit from said Clients' bank account (the corresponding expenses being borne by the Client) in accordance with any of the three payment methods or plans below:

- Continuous traffic plan: If the Client intends to receive traffic in a continuous manner, without being subject to the obligation not to exceed any daily or monthly cap, then the Client shall be subject to a regular traffic payment plan. An automated debit shall be made from the Client's card as soon as the Client's account reaches a balance equivalent to only 3-5 days of remaining traffic.

- Prepaid payment plan: The Client is free to provision his account whenever it sees fit (check or *carte bleue*).

The provisions above shall remain applicable in the event that services are supplied through a Proxy Agency. The advertiser shall, in any event, remain solely responsible for the payment due in relation to the clicks generated and recorded on the Sponsored Links.

**7.5  Delay and late payment:** Penalties for late payment, of an amount equal to 1.5 (one and a half) times the official interest rate, shall be due without any reminder being required. Notwithstanding the above and without prejudice to its other rights, Yahoo! Search Marketing reserves the right to suspend a Client's Yahoo! Search Marketing account after a reminder letter for outstanding sums sent by registered mail with return receipt requested (hereinafter "RMLRR") and/or after an e-mail, remaining unsuccessful within three (3) days of its receipt by the Client, regardless of the reason for the non-payment. If within 15 (fifteen) days of receipt of the RMLRR or of the e-mail, sums due to Yahoo! Search Marketing remain unpaid, the Client's Yahoo! Search Marketing account shall be closed definitively without any prior notice, formality or indemnity in favor of the Client, such action resulting in the termination of the Client's Insertion Order, without prejudice of Yahoo! Search Marketing's other rights. All costs related to the collection that may be incurred by Yahoo! Search Marketing shall be borne by the Client.

**8.  TERMS GOVERNING THE CLIENTS' WEBSITE:** The Clients hereby acknowledge and agree: (i) that Yahoo! Search Marketing is not responsible for their website(s), or for the contents and maintenance of such website(s), or for any transaction that may be carried out by Internet users (and in particular any orders, payments, browsing, etc.); (ii) that they are responsible for updating their Sponsored Links if such Sponsored Links no longer correspond to the data available on their websites or on the pages to which such data refer; (iii) that their website(s) does/do not include any contents owned by Yahoo! Search Marketing, whether such contents are fully owned or licensed, including; (iv) to grant to Yahoo! Search Marketing the irrevocable right to access, display, use, reproduce or represent all or part of their website(s) and/or Sponsored Links, free of charge and for the purposes and within the limits hereof.

**9.  CONFIDENTIALITY:** The terms "Confidential Information" refer to any information communicated directly or indirectly by Yahoo! Search Marketing to the Clients, whether in writing or orally, except for any information in respect of which it is possible to prove: (i) that such information was known to the public or had fallen into the public domain prior to the date on which it was communicated by Yahoo! Search Marketing; (ii) that, for reasons not attributable to the Clients, such information has become public and has been communicated generally after having been disclosed by Yahoo! Search Marketing to the Clients; or (iii) that such information was in

the Clients' possession, without being subject to any confidentiality obligation upon being disclosed to the Clients by Yahoo! Search Marketing. The Clients shall refrain at all times from communicating, selling, licensing, transferring or making available to any person any Confidential Information in any form whatsoever. The Clients agree to use any Confidential Information in strict compliance with the purpose for which such Confidential Information has been communicated or when such communication is mandated by applicable law or by a decision of a judicial or administrative authority. The Clients agree to take all reasonable steps in order to protect the Secret Nature of the Confidential Information and prevent its unauthorized disclosure or use. All of the Confidential Information shall in any event remain the exclusive property of Yahoo! Search Marketing. All documents, electronic media and other materials containing any Confidential Information or relating thereto, shall be delivered forthwith to Yahoo! Search Marketing on first demand.

## 10. CLIENT'S REPRESENTATIONS AND WARRANTIES:

10.1  The Client represents and warrants that it has the powers necessary for execution of the Insertion Order and the acceptance hereof.

10.2  The Client warrants that the Sponsored Links, including graphic materials, if any, as well as the key words used by the Client, do not breach any applicable law, regulation or standard currently in force (in particular as regards advertising, sales promotion, competition, intellectual property, use of the French language, personal rights or collection of personal data), or any rights of third parties (in particular personal rights, intellectual property rights, corporate name, trade name, trade sign, domain name) or any of the codes of professional conduct or the Yahoo! Search Marketing's Privacy Charter, and do not include any elements that are libelous or damaging vis-à-vis any third parties. The Client expressly warrants that it shall be personally responsible for securing all rights and authorizations necessary in order to circulate the Sponsored Links and/or has all rights in and to the Sponsored Links and has to that end paid all remunerations due, in particular in respect of the reproduction and communication of the Sponsored Links and provision of the same to the public, and has executed all agreements and obtained all authorizations required from all natural and legal persons acting, in any respect whatsoever, for the production of the Sponsored Links or entitled to claim rights in and to the use of the Sponsored Links.

10.3  The Client warrants that the Sponsored Links do not give access to any sites whose contents are contrary to Yahoo! Search Marketing's editorial line and/or laws and regulations currently in force (and in particular do not present any libelous or infringing information or material) or harm the reputation of Yahoo! Search Marketing and/or its partner sites.

10.4  The Client also agrees not to deactivate, for any reason whatsoever, during the term hereof, the "return" function made available to Internet users by the browser that they are using, in order to enable Internet users, by activating such function, to return to the pages of the Yahoo! Search Marketing Network.

10.5  The Client agrees to be solely responsible for defending any claim, subject to Yahoo! Search Marketing's right to participate in such defense, with the counsel of its choosing. The Client also agrees to bear all damages and losses resulting from the above causes, whether in favor of third parties or Yahoo! Search Marketing, it being agreed that no settlement agreement imposing on Yahoo! Search Marketing any obligation or expense shall be executed without securing Yahoo! Search Marketing's prior written consent. The Client agrees to hold free and harmless Yahoo! Search Marketing, as well as its officers, employees or affiliates against any claim, action and/or remedy of a third party in relation to any violation of its obligations hereunder, or in relation to any impairment of the rights of third parties or violation of any law and/or regulation currently in force, and agrees to indemnify Yahoo! Search Marketing against any damaging consequences directly or indirectly linked to any such violation because of the circulation of the Sponsored Links and/or the use of key words in relation to the Sponsored Links. If the Client is informed of any claim asserted by a third party, whether in respect of any violation of a right or in respect of any violation of a regulation, the Client agrees to immediately inform Yahoo! Search Marketing of such claim, and Yahoo! Search Marketing shall, in such event, be entitled to suspend and/or interrupt the display of the Sponsored Links, and such suspension and/or interruption shall not give rise to any indemnification. The guarantee shall in particular cover any indemnities paid in connection with any settlement and/or judicial action, award and/or sanctions that may apply to Yahoo! Search Marketing and shall extend to any legal expenses, including any

unrecoverable expenses, attorneys' fees and expenses.

10.6    The Client warrants that the Sponsored Links do not allow, in any manner whatsoever, for the collection or identification of any personal data belonging to the users of such Sponsored Links, regardless of the nature of such data, unless with the consent of the users and Yahoo! Search Marketing.

11.    **WARRANTY EXCLUSION:** The Client acknowledges and agrees that the use of the Yahoo! Search Marketing Services shall be made under the Client's sole responsibility. Neither Yahoo! Search Marketing nor its employees, contractors or any other entity belonging to the Yahoo! Group or the Yahoo! Search Marketing Network gives any guarantee, and each excludes any responsibility, in particular as regards (i) the success of the Clients' advertising campaign or results obtained in connection therewith, (ii) the availability of the key words and their use in relation to the Client's Sponsored Link and/or website promoted by the Client, and in particular, but not limited to, in respect of the Intellectual and Industrial Property Rights and/or personal rights of third parties, and (iii) in the event of unavailability of the services because of technical malfunctions or the unavailability of the bandwidth on the telecommunication lines.

12.    **DISCLAIMER:** The liability of Yahoo! Search Marketing, of any entity of the Yahoo! Group, of its information providers, licensors, licensees, consultants, agents, service providers, entities belonging to the Yahoo! Group and to the Yahoo! Search Marketing Network (Partner Sites, agents, employees), whether invoked on grounds of any non-performance, error, omission, interruption, suppression, lack of delivery of merchandise, late implementation or transmission, computer virus, unavailability of the communication lines, theft, destruction or unauthorized access to files, amendment thereto or illegal use thereof, contractual breach, fault, or on any other grounds, may not be incurred unless a fault is proved within 12 months from the date of the triggering event and shall be strictly limited to the amount actually paid to Yahoo! Search Marketing by the Clients in order to place their Sponsored Links during the half-year preceding the triggering event. In no event shall Yahoo! Search Marketing or any entity of the Yahoo! Group, its information providers, licensors, licensees, consultants, agents, service providers, or any entity belonging to the Yahoo! Search Marketing Network or its agents and/or employees be held liable for any indirect damage (in particular any loss of data, data use loss, loss of income, financial and/or commercial loss and/or image loss, etc.) resulting from the performance of the Insertion Order and these terms and conditions, from the use and/or impossibility of using the Yahoo! Search Marketing Services or from any breach of a guarantee. The Clients waive the right to institute any tort action against Yahoo! Search Marketing in relation to the selection of the Yahoo! Search Marketing Services and/or the Partner Sites, or as regards any actions, errors and omissions committed by them. This disclaimer applies in particular to those third parties on which Yahoo! Search Marketing calls for the management of various parts of the Yahoo! Search Marketing Services, and to which Yahoo! Search Marketing provides Sponsored Links.

13.    **TERM:** The term of the circulation of the Clients' advertising campaign is that indicated on the Insertion Order (see Article 6 as regards the term and renewal of the advertising campaigns) or is the term indicated as regards those Clients managing themselves their on-line campaign under on-line payment plans (see Article 7.4).

14.    **SUSPENSION – TERMINATION**

14.1    The Clients may, at any time, definitively discontinue the circulation of their advertising campaign by giving Yahoo! Search Marketing notice of their intent to definitively terminate their account and terminate their Insertion Order, by connecting to the *"Manage my account"* interface or by contacting their Account Manager or a Client Service customer advisor, so that said Account Manager interrupts the Client's interface in the *"Manage my account"* interface *(click here for more information).* The circulation of the advertising campaign shall cease immediately upon receipt of the Client's notice, and any amount due by the Client shall be paid to Yahoo! Search Marketing.

14.2    Yahoo! Search Marketing reserves, at its entire discretion, the right to give the Client notice either of the suspension or of the termination of the Client's Yahoo! Search Marketing account, at any time, without any delay or

indemnity in favor of the Client and without any prejudice to the other rights of Yahoo! Search Marketing, subject to the terms and conditions set forth below:

- If the Client has not sent to Yahoo! Search Marketing a Renewal Order in relation to the Client's campaign prior to the end of such campaign. The account shall then be suspended pending renewal of the campaign.

- Subject to any mandatory legal provisions, if the Client is subject to insolvency proceedings. In such event, the Client's Yahoo! Search Marketing account shall be definitively suspended or terminated; and the Insertion Order shall be terminated without any prior notice, formality or indemnity in the Client's favor.

- If the Client fails to comply with its obligations set forth herein and in particular the guarantees detailed under Article 10 hereof, or if the Client's conduct is detrimental to Yahoo! Search Marketing, to the other Clients of Yahoo! Search Marketing, to its partners or partner sites and to Internet users. In such event, Yahoo! Search Marketing shall give the Client an e-mail notice of the suspension of its account and reasons therefor. If, within 5 (five) days of such notice, the Client has not remedied the breach invoked by Yahoo! Search Marketing, then Yahoo! Search Marketing reserves the right to terminate the Insertion Order, without any prior notice, formality or indemnity in favor of the Client, without prejudice to any indemnities and other rights in favor of Yahoo! Search Marketing. In any event, the Client shall be responsible for paying any and all amounts due to Yahoo! Search Marketing.

14.3.   Any and all provisions concerning in particular confidentiality, guarantees, payment and liability shall survive the termination of contractual relationships between Yahoo! Search Marketing and the Clients.

15.   **REIMBURSEMENTS OF AMOUNTS ON THE CREDIT OF THE YAHOO! SEARCH MARKETING ACCOUNT:** Unless a fault is committed by the Client, the closing of the Yahoo! Search Marketing account shall trigger repayment to the Client of any amounts credited to the Client's account and against which no amount has yet been applied. No repayment shall be made in respect of the initial deposit and the minimum monthly expense required by Yahoo! Search Marketing.

16.   **UTILIZATION OF THE MATERIALS RELATED TO THE SPONSORED LINKS ON THE YAHOO! SEARCH MARKETING NETWORK:** By using the Yahoo! Search Marketing Services (including the information intended for the Sponsored Links), the Clients irrevocably assign to Yahoo! Search Marketing and to the partner sites the right to use, reproduce, represent or modify all or part of such materials, free of charge and subject to the limits set forth herein.

17.   **NOTICES:** Yahoo! Search Marketing may give notices to the Clients in general on the Yahoo! Search Marketing Network or at the following address: http://searchmarketing.yahoo.fr. Any individual notice shall be given by mail and/or e-mail, to the post office address or e-mail address indicated to Yahoo! Search Marketing by the Client. The Clients shall be responsible for ensuring the accuracy of their addresses and any other information provided to Yahoo! Search Marketing. Any electronic messages shall be deemed received on the date of their receipt by the intended recipient as indicated on the sender's return receipt. Any electronic message received during a weekend or legal holidays shall be deemed received on the following working day. Any registered mail return receipt requested shall be deemed received on the date indicated on the return receipt request filled in by the intended recipient.

18.   **GOVERNING LAW – JURISDICTION:** These General Terms and Conditions for Advertisers and the Insertion Order shall be governed by French law. **THE COURTS LOCATED WITHIN THE VENUE OF THE PARIS COURT OF APPEALS SHALL HAVE SOLE JURISDICTION AS REGARDS ANY DISPUTE ARISING IN CONNECTION WITH THE VALIDITY, INTERPRETATION OR PERFORMANCE OF THESE TERMS AND CONDITIONS AND THE INSERTION ORDER.**

## 19. MISCELLANEOUS PROVISIONS:

**19.1** The Insertion Order and the General Terms and Conditions for Advertisers shall supersede and replace any prior agreements, proposals and communications, whether made orally or in writing, between Yahoo! Search Marketing and the Clients. Each Insertion Order and the General Terms and Conditions shall form an indivisible whole containing the agreement of the Parties as regards the relevant subject matter.

**19.2** Yahoo! Search Marketing reserves the right to amend the General Terms and Conditions for Advertisers. The amended General Terms and Conditions shall come into force from the moment they are put on line on the Yahoo! Search Marketing site at the following address: http://searchmarketing.yahoo.com/fr_FR/legal/piterms.php shall apply by right to all Insertion Orders that will be signed following this putting on line. Concerning the Insertion Order in progress, the amended General Terms and Conditions for advertisers shall come into force one month after their notification to Clients, except in the case they are expressly refused by the Client.

**19.3** The Clients may not resell, assign or transfer to any natural or legal person, including to any parent, fellow subsidiary or subsidiary, any of the rights granted hereunder and/or under the Insertion Order. Any attempted resale, assignment or transfer shall result in the immediate termination of the Insertion Order without any liability of Yahoo! Search Marketing and subject to any and all damages possibly accruing to Yahoo! Search Marketing.

**19.4** Clients acknowledge and accept that all data, information, datafiles and all other digital elements exchanged with Yahoo! Search Marketing, as well as all other expressions of intention including the ones made by electronic means relating to the , Clients' consent to these General Terms and Conditions or to their successive amendments, resulting from the continuation of the use of the Yahoo! Search Marketing service by Clients after the amendments having been put on line, shall constitute valid, admissible, opposable evidence which will have the probative value of a contract.

The Client undertakes to refrain from contesting the admissibility, the effectiveness, the opposability or the probative value of the elements that have an electronic nature or format, on the ground of their electronic nature.

Except where evidence to the contrary is brought, these elements shall be valid and opposable to Clients in the same way, under the same conditions and with the same probative value than any document that may be established, received or kept in writing.

These General Terms and Conditions were last revised on 25 July 2006.



**YAHOO! Finance**

EM M EXECUTIVE MASTER'S IN TECHNOLOGY MANAGEMENT

AN MSE FROM PENN ENGINEERING, CO-SPONSORED BY

Penn Engineering

first Wha UNIVERSITY of

SEARCH SI

## BusinessWeek online

Advanced S

TOP NEWS | BW MAGAZINE | INVESTING | ASIA | EUROPE | **TECHNOLOGY** | AUTOS | INNOVATION | SMALL BIZ | B-SCHOO

FEBRUARY 27, 2006
NEWS ANALYSIS
By Burt Helm

TOI
POPU



# Click Fraud Gets Smarter

**Internet ad-traffic scams could be ripping off as much as $1 billion annually. Are Web companies like Google doing enough to foil them?**

BUSINESS DIRECTORY
Find services and
products now.

1. Select industry
Technology

2. Select service
Antivirus / Antispam
Solutions
Business
Continuity
Collaboration
Solutions

Web consultant Greg Boser has an ingenious method for sending loads of traffic to clients' Internet sites. Last month he began using a software program known as a clickbot to create the impression that users from around the world were visiting sites by way of ads strategically placed alongside Google search results. And because Google charges advertisers on a per-click basis, the extra traffic could mean sky-high bills for Boser's clients.

STORY TOOLS
▸ Printer-Friendly Version
▸ E-Mail This Story
▸ Reader Comments

**Sun** share

Get Free

1. Whe Is in
2. Clic Sma
3. Say Jee
4. iPod by S
5. Gett Hom

POLL  INSTANT SURVEY >>

A federal judge may order a U.S. shutdown of the BlackBerry e-mail service. What would that mean for you?

   I'll be lost

   I'll use a Palm or some other handheld instead

   I'm not worried. Research In Motion has a workaround and will probably settle

   What's a BlackBerry?

VIEW POLL RESULTS >>

MARKET

DJIA
S&P 500
Nasdaq

STOCK L

Stocks
M&A, Oi
Create /
Launch P

ADVERTISEMENT



A car driven to perform.

ACURA

PEOPLE SEARCH

**Search for business contacts:**

First Name :

Last Name :

Company Name :

PREMIUM CONTENT
MBA Insider

BW MAGAZINE
Get Four Free Issues
Register
Subscribe
Customer Service

ONLINE FEATURES
Book Reviews
BW Video
Columnists
Interactive Gallery
Newsletters
Past Covers
Philanthropy
Podcasts
Special Reports
BLOGS
Auto Beat

But Boser's no fraudster. He cleared the procedure with clients beforehand and plans to reimburse any resulting charges. What's he up to? Boser wants to get to the bottom of a blight that's creating growing concern for online advertisers and threatens to wreak havoc across the Internet: click fraud.

Blogspotting
Brand New Day
Byte of the Apple
Deal Flow
Economics Unbound
Fine On Media
Hot Property
Investing Insights
NussbaumOnDesign
Tech Beat
Working Parents
| TECHNOLOGY
J.D. Power Ratings
Product Reviews
Tech Stats
Wildstrom: Tech Maven
| AUTOS
Home Page
Auto Reviews
Classic Cars
Car Care & Safety
Hybrids
| INNOVATION & DESIGN
Home Page
Architecture
Brand Equity
Auto Design
Game Room
| SMALLBIZ
Smart Answers
Success Stories
Today's Tip
| INVESTING
Investing: Europe
Annual Reports
BW 50
S&P Picks & Pans
Stock Screeners
Free S&P Stock Report
| SCOREBOARDS
Mutual Funds
Info Tech 100
S&P 500
| B-SCHOOLS
MBA Blogs
MBA Profiles
MBA Rankings
Who's Hiring Grads
| BW EXTRAS
BW Digital
BW Mobile
BW Online Alerts

**BILLION-DOLLAR QUESTION.** The practice can wildly skew statistics on the popularity of an ad, drain marketing budgets, and enrich the scam artists behind it. While click fraud isn't new, the methods for carrying it out — take Boser's clickbot software — are getting increasingly sophisticated. And some advertisers, analysts and consultants question whether Web companies such as Google (GOOG) and Yahoo (YHOO) are doing enough to nip click fraud in the bud. "No one has any idea how much of this is actually going on," says Boser. "So we're going to see how well [the search engines] actually try to protect advertisers."

One of Boser's biggest challenges is putting a finger on exactly how widespread the practice is. Some search consultants say click fraud accounts for upwards of 20% of all traffic, and may generate more than $1 billion in dubious sales a year. Others say those stats vastly overstate the problem.

Now, one of the biggest players in fraud detection aims to end the guessing. Fair Isaac (FIC), which analyzes 85% of U.S. credit card transactions, will unveil plans at this week's Search Engine Strategies Conference for what it says is the most rigorous study ever of click fraud. Fair Isaac will invite companies to submit traffic data that can be mined for aberrations that may signify fraud. "We've seen indications that the overall losses due to click fraud could equal more than $1 billion [a year] — larger than the total magnitude of credit card fraud in the U.S.," says Kandathil Jacob, Fair Isaac's director of product marketing. "It's certainly worth our effort to look at it."

**MORE CLICKS, MORE DOLLARS.** A rising number of companies would agree. The percentage of advertisers listing click fraud as a "serious" problem tripled in 2005, to 16%, according to a survey by the Search Engine Marketing Professional Organization. Advertisers have filed at least two class-action suits saying Google, Yahoo, and other search engines ought to be more up-front about methods for combating the practice. Google says the suits are meritless. Yahoo declines to comment.

And in January, Standard & Poor's equity analyst Scott Kessler downgraded Google stock in part because he considers click fraud a "notable risk" (see BW Online, 1/17/06 "S&P Downgrades Google to Sell"). Among his concerns: the prospect of false clicks may sour companies from placing ads on Google. He too says Google needs to be more forthcoming on the issue. "No one has any idea as to what Google assesses [as] its own percentage of clicks that are generated by fraud, no idea what that process consists of, and all the things that are being done to battle it," he says.

Attention to online fraud will only increase as advertisers devote more of their budgets to the Net, where the cost of ads varies by frequency of clicks. The more times an ad is clicked, the more the advertiser pays. In one of the most common categories of pay-per-click ads, the ad shows up next to search results.

**INVESTIGATING COMPLAINTS.** The other common type is known as a contextual ad, where ads are placed on third-party Web sites. Ad revenue is split between the Web site publisher and the company, such as Google or Miva (MIVA), that works as a middleman, matching advertisers to relevant sites. Yahoo's comparable contextual-ad program is still in testing. It's with these types of ads that serious damage can be done by site owners who fraudulently click ads appearing on their own Web pages, security experts say.

PREMIUM SEARCH
Search by job title, geography and build a list of executive contacts

SEARCH BY
❋ zoominfo

TECH WHITE PAPERS
▸ Most Recent
▸ Most Popular

DW Online Alerts
Dashboard Widgets
Podcasts RSS 2.0
RSS Feeds RSS 2.0
Reprints/Permissions
Conferences
Investor Workshops
Research Services

So how do they do it? This isn't the work of a lone Webmaster with an itchy mouse finger. Software like Boser's routes traffic all over the Internet through anonymous "proxy" servers scattered in far-flung locales, creating the illusion that visitors are logging on from all over the place, masking the traffic's true origin.

Then there are software companies with names like Fakezilla that sell traffic simulators online for as low as $40, advertising them as a way to "improve your site profits." The owner of Fakezilla, who would only give his name as Jack, says the software is intended to make sites appear popular and thus boost ranking on search engine pages. He concedes it can be used for other purposes.

**"BLOODSUCKING MOSQUITOES."** Security experts say that filtering out some software-created traffic is easy, since it's possible to detect when it comes from anonymous sources. "We feel that 99% of legitimate traffic has no reason to use anonymous proxies," says Dmitri Eroshenko, founder of click fraud consultancy Click Labs. "As far as finding them, it's just a matter of checking who the [server] address is registered to."

It gets more complicated when a hacker employs a whole network of clickbots. In this scenario, a virus writer could release a worm that infects thousands of unprotected PCs, making them slaves to the hacker. He could then route traffic from real computers all over the world to his network of sites.

With enough Web pages and enough "zombie" computers, each clicking and receiving clicks just a few times a day, a hacker could create a tidy business that's nearly impossible to detect, says Ken Dunham, a Web-security expert with Verisign-owned iDefense. "They're bloodsucking mosquitoes, and you just can't get them all," says Dunham, who works with law enforcement officials to track down hackers and online con artists.

**UNDER INVESTIGATION.** Meanwhile, code for botnet software is becoming more freely available on the Internet, making it easier for would-be hackers to disseminate spam or perpetrate identity theft and click fraud. "In August, 2004, we predicted we'd see exponential growth, and that's exactly what we saw," says Dunham.

Google and Yahoo say they strive to weed out all kinds of illegitimate traffic. "Monitoring compliance is a regular activity for us," says Shuman Ghosemajumder, manager of the Google team that monitors invalid click activity. To stop click fraud, Google uses software to scour Web traffic through its ads for repeated clicks, unusual patterns and visits from anonymous and overseas proxy servers. The program filters out what it deems invalid, and doesn't charge advertisers. When an advertiser complains about potential click fraud, a special team investigates and determines a refund is warranted, says Ghosemajumder.

Says John Slade, Yahoo's senior director of product management: "Click [fraud] is a serious but manageable challenge. It's challenging, and that's why we've built up a system that we continually refine and update for new patterns and problems."

**"LACK OF TRANSPARENCY."** Some advertisers remain skeptical. A class-action lawsuit led by Texarkana, (Ark.)-based Lane's Gifts & Collectibles accuses Google of reticence and conflict of interest over the matter. A pay-per-click system "is not structurally designed to avoid these problems — in fact it facilitates them," says Stephen Malouf, who is representing Lane's and the other companies. "I don't attribute any malevolence to (the search engines), but there is a lack of transparency...what's needed is a trusted third party that the industry decides on collectively."

Until then, Boser is taking matters into his own hands. He wants to ensure click fraudsters don't take his clients' dough into theirs.

Helm is a reporter for BusinessWeek Online in New York

### READER COMMENTS

## Most recent comments

See all comments
Leave your own comments

**Nickname: larisa**
**Review:** StudioTraffic was claimed as a traffic-creating scam before. Controversy regarding its business model and legitimacy is echoing everywhere. I am wondering, is this program similar to the program that the article mentions.
**Date reviewed:** Feb 27, 2006 5:41 PM

**Nickname: gigslist**
**Review:** Something to report. I did a search on click bot and found a popular freelancer referral site promoting jobs for click bot creators and a company saying they will create click bots. See link below.
http://www.elance.com/c/rfp/main/jobinfo.pl?jobid=9485372&catid=10224
**Date reviewed:** Feb 27, 2006 5:12 PM

**Nickname: Martyn**
**Review:** The fraudsters themselves benefit by providing a service along the lines of "we'll click on your competitors and hurt their business." As search-engine marketing grows, ad pricing will reach an equilibrium where advertising costs are just below advertising returns. If Google and Yahoo allow click fraud to continue, the advertisers' sales conversion rate will decrease and clicks will be devalued. So in the long term, there's no benefit for search engines to allow click fraud to continue. The fake clickers and the unscrupulous businesses that use their services are the only beneficiaries of click fraud.
**Date reviewed:** Feb 27, 2006 4:13 PM

**Nickname: Herr X**
**Review:** I do not think click fraud is profitable for advertising companies. It is like

BW MALL  SPONSORED LINKS

- **White papers Collaboration in Financial Services** A top industry consultant recommends that financial companies implement collaboration technologies such as workflow, instant messaging and virtual workspaces. Download this free white paper to learn more about collaboration in financial markets.

- **All the server hosting services you need** Looking for dedicated server hosting with Windows, RedHat or Sun Solaris? Firewall protection? Oracle database? Data backups? BTInet's got it all, at a price you can afford. Contact us and you'll see what we mean.

- **Batteries for Portable Electronics from AtBatt.com** AtBatt.com offers IT Managers a Battery Configurator to correctly identify the proper Laptop Battery and Computer Power Supply. Our laptop battery brands include Apple, Compaq, Dell, Fujitsu, HP, IBM, Panasonic, Sony, Toshiba and more.

- **DOVICO Time & Project Tracking Software** Award Winning Project Tracking And Costing Software Application!

- **Free Worldwide Website Monitoring** Get your worldwide response time

instantly, see your site performance in many cities absolutely free, failure
monitoring, ad campaign suspension and notification is available for a fee

**Buy a link now!**

Get BusinessWeek directly on your desktop with our **RSS feeds.**

Add BusinessWeek news to your Web site with our **headline feed.**

Click to buy an **e-print or reprint** of a *BusinessWeek* or BusinessWeek Online
story or video.

To subscribe online to *BusinessWeek* magazine, please **click here**.

Learn more, go to the **BusinessWeekOnline home page**

▲
BACK TO TOP

Advertising | Special Sections | MarketPlace | Knowledge Centers

Terms of Use | Privacy Notice | Ethics Code | Contact Us

The McGraw-Hill Companies

Copyright 2000- 2006 by The McGraw-Hill Companies Inc.
All rights reserved.

**From:**     "Yahoo! Search Marketing" [platinum-ysm@yahoo-inc.com]
**Sent:**     Wednesday, September 06, 2006 3:29 PM
**To:**       Ira Weinstein; Joanie Yannotti
**Subject:**  Re: Case #103236348

Sep 6 2006  12:27 PT

Hello Joanie,

This e-mail is to confirm a credit to your account in the amount of $17,082.80 on 08/01/06 for clicks reviewed between 04/28/06 – 06/28/06.

If you have further questions on this matter, please do not hesitate to contact us further.

Thank you,

Sincerely,

Garen Der-Grigorian
Platinum Specialist
Direct Platinum Team
Yahoo! Search Marketing
platinum-ysm@yahoo-inc.com
(866) 924-6676